UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICAELA OCHOA,<br><br>              Plaintiff,<br><br>    v.<br><br>SANTA CLARA COUNTY OFFICE OF<br>EDUCATION, et al.,<br><br>              Defendants. | Case No.16-cv-03283-HRL<br><br>**ORDER GRANTING-IN-PART AND<br>DENYING-IN-PART DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 38 |

        Plaintiff Micaela Ochoa ("Ochoa"), the former Chief Business Officer at Defendant Santa Clara County Office of Education ("SCCOE"), sues her former employer and Defendant Jon Gundry ("Gundry"), the Superintendent, for retaliatory termination in violation of her First Amendment rights and a California whistleblower statute. Dkt. No. 1. She asserts that she engaged in protected speech on two occasions—first, in reporting a perceived violation of law related to the preparation of Gundry's W-2 in February 2015, and second, in speaking out about potential non-compliance with the California Public Records Act ("CPRA") in June 2015—and that this speech was a substantial or motivating factor in her termination. Defendants move for summary judgment, or, in the alternative, partial summary judgment, and assert various legitimate and non-retaliatory reasons for Ochoa's termination. Dkt. No. 38.

        The parties have consented to magistrate judge jurisdiction. Dkt. Nos. 7, 11. For the reasons explained below, the court grants-in-part Defendants' motion for partial summary judgment only as to Ochoa's damages for lost wages for the time remaining on her employment contract. The court denies Defendants' motion for summary judgment, or, in the alternative, partial summary judgment, in all other respects.

**BACKGROUND**

SCCOE hired Ochoa to serve as its Chief Business Officer in August 2012. Dkt. No. 41, Ochoa Decl., ¶ 4. Her contract, originally for a two-year term, was extended in late 2013 and expired June 30, 2016. Dkt. No. 38, Gordillo Decl., Ex. 2. Ochoa's employment could be terminated without cause; but if this provision were exercised prior to the end of the term, her contract provided for a cash settlement not to exceed her monthly salary multiplied by the number of months remaining on the contract (up to 12 months). *Id.* Ochoa's annual salary in 2012-2013 was $205,000, not including deferred compensation and other benefits. *Id.*

All SCCOE employees report to the Superintendent. Dkt. No. 38, Gundry Decl., ¶ 7. To manage the large agency, the Superintendent hires a cabinet of officers. *Id.*, ¶ 8. He or she may terminate these cabinet officers with or without cause. *Id.*, ¶¶ 10, 11. This is meant to ensure that the Superintendent has a cabinet of advisors he or she trusts. *Id.* The Superintendent reports to the Board of Education, but the Board does not employ any other employees of SCCOE. *Id.*, ¶ 7. SCCOE hired Gundry to serve as Superintendent in the summer of 2014. *Id.*, ¶ 2.

By all accounts, SCCOE in 2014 and 2015 was not a fun place to work. In their declarations and depositions, current and former Board and cabinet members were all too willing to criticize each other. Chief Human Resources Officer Phillip Gordillo and Gundry both asserted that Ochoa did not get along with at least two of her colleagues. Dkt. No. 38, Gordillo Decl., ¶ 4, Gundry Decl., ¶ 17. Chief Strategy Officer Toni Cordova reported that two of her co-workers argued, and that another "constantly complained about everything." Dkt. No. 43, Cordova Decl., ¶¶ 31, 34. Gundry testified that cabinet member Kelly Calhoun and General Counsel Maribel Medina had a contentious relationship. Dkt. No. 40, Mehta Decl., Ex. D, Gundry Dep. ["Gundry Dep."], 26:18-24. Medina accused Gundry of harassment and racial discrimination. Dkt. No. 44, Medina Decl., ¶ 11. Gundry described the cabinet environment as "toxic," stating, "I thought every person in the room brought conflict to the cabinet." Gundry Dep., 56:14-25.

The story of Gundry and Ochoa's relationship dates back to 2013, when Ochoa lost "more than half" of her payroll staff. Dkt. No. 41, Ochoa Decl., ¶ 78. Suspecting problems in that department, Ochoa recommended hiring a new auditing firm to review the payroll. *Id.*, ¶ 79. The auditors found various issues. *Id.*, ¶ 81. Gundry learned of the 2013 payroll errors in fall 2014.

Dkt. No. 38, Gundry Decl., ¶ 18. He recalled concluding that the payroll errors occurred "due to Plaintiff's poor oversight." Dkt. No. 38, Gundry Decl., ¶ 20; Gundry Dep., 21:22-25. Gundry testified that he never spoke to Ochoa about the payroll audit or issued any written discipline to her related to the 2013 payroll problems. Gundry Dep., 15:15-24, 20:20-23, 21:22-25.

The payroll investigation spawned another inquiry, this one into misrepresentations an SCCOE staff member made to the IRS. Though Gundry suspected that Ochoa may have been involved, Gundry ultimately testified that the misrepresentations "had nothing to do with Ms. Ochoa." Dkt. No. 38, Gundry Decl., ¶¶ 27-29; Gundry Dep., 28:7-25.

The events related to Ochoa's first instance of alleged protected speech concern Gundry's compensation, which included moving expenses. Ochoa states that she first told Gundry that his moving expenses were taxable in August 2014. Dkt. No. 41, Ochoa Decl., ¶ 13. Gundry disputed this account when the issue came to a head in February 2015, claiming in an e-mail that Medina said his moving expenses would not be taxed. *Id.*, Ex. A. Medina denies having said this. Dkt. No. 44, Medina Decl., ¶ 6.

Regardless of what Gundry had previously been told, he was "very irritated" to receive a revised W-2 in February 2015 listing his moving expenses as taxable income. Dkt. No. 41, Ochoa Decl., Ex. A. After exchanging e-mails with Ochoa about the issue, and questioning why Ochoa and not Ted O—SCCOE's Director of Business Services, who worked directly for Ochoa and handled W-2s—had responded to his concerns, Gundry went to Ted O's office and yelled at him. Dkt. No. 42, O Decl., ¶¶ 7-21; Dkt. No. 38, Gundry Decl., ¶ 35 (explaining that he was angry about O's unresponsiveness). According to O, Gundry said "if he could not trust Ochoa and [O], we had 'to go,' and [Gundry] made a hand gesture with his thumb, like 'you're out of here.'" Dkt. No. 42, O Decl., ¶ 21, 22. O reports being so frightened by the confrontation that he purchased pepper spray in case Gundry became violent. Dkt. No. 42, O Decl., ¶ 23.

Though the record does not contain any direct evidence that Gundry asked Ochoa or O to change his W-2, both Ochoa and O understood Gundry's comments as an attempt to bully them into doing so. Dkt. No. 42, O Decl., ¶¶ 24, 25, 28; Dkt. No. 41, Ochoa Decl., ¶¶ 29, 42-46, 57. Further, both believed that intentionally preparing an incorrect W-2 would be tax fraud, and that

3

Gundry's bullying behavior was itself harassment in violation of state or federal law. *Id.* Fearing retaliation, Ochoa reported these events to Darcie Green, the President of the Board of Education. Dkt. No. 41, Ochoa Decl., ¶¶ 49, 51; Dkt. No. 39, Mehta Decl., Ex. B, Green Dep. ["Green Dep."], 42:8-11, 49:16-24, Ex. 2. Gundry denies ever being aware of Ochoa's complaint to Green, Dkt. No. 38, Gundry Decl., ¶ 55, and states that he did not know that Ochoa was involved in O's complaint, *id.*, ¶ 36. Nevertheless, Gundry testified that Green told him to "watch [his] tone." Gundry Dep., 84:2-9. And Green recalled speaking with Gundry about the complaint from Ochoa and O multiple times. Green Dep., 71:5-72:10.

After this episode, Ochoa reports that she observed a change in Gundry's demeanor towards her, which she describes as a "distinct chilling" in his behavior. Dkt. No. 41, Ochoa Decl., ¶ 70. She also states that Gundry ceased his regular meetings with her in March 2015. *Id.*, ¶ 69. At around the same time, Gundry informed Gordillo in Human Resources that he intended to terminate Plaintiff's employment and asked him to draft a termination letter and separation agreement. Gordillo Decl., ¶ 10.

Ochoa's second instance of alleged protected speech relates to a California Public Records Act ("CPRA") request concerning contracts promoted by Gundry. Though there were other contracts involved, one set involved Mark Skvarna, a consultant Gundry hired to assist with various tax and payroll problems. Dkt. No. 38, Gundry Decl., ¶ 40. Gundry came to trust Skvarna, ultimately concluding by the end of the 2014-2015 academic year that he could replace Ochoa. *Id.*, ¶ 41. Not everyone felt as comfortable with Skvarna: both Cordova and Medina complained about his racist and sexist comments. Dkt. No. 43, Cordova Decl., ¶ 15; Dkt. No. 44, Medina Decl., ¶ 9. Medina also notified Gundry that Skvarna's business was not registered with the California Secretary of State. Gundry Dep., 25:10-14.

In June 2015, reporter Josh Koehn of *San Jose Inside* submitted a CPRA request for various SCCOE contracts. Communications Director Kenneth Blackstone fielded the request. Dkt. No. 38, Blackstone Decl., ¶¶ 1, 2. After speaking to Gundry, Blackstone produced the documents deemed responsive on June 15, 2015. *Id.*, ¶ 3. The next day, Ochoa e-mailed Blackstone and Gundry, expressing her concern that Blackstone's June 15 e-mail was inaccurate.

*Id.*, ¶¶ 4, 5, Ex. 3.  She also forwarded additional documents she considered responsive.  *Id.*

Blackstone met with Gundry to discuss Ochoa's e-mails, and Gundry directed Blackstone to "get a

legal opinion" about whether the new documents were responsive.  *Id.*, ¶ 6.  SCCOE produced the

additional contracts to Koehn, and, after Ochoa e-mailed Blackstone with another potentially

responsive document, SCCOE produced that document, as well.  *Id.*, ¶¶ 6, 7, 8.  Ochoa's e-mails

expressed her concerns that SCCOE was violating the CPRA.  *Id.*, Exs. 5, 6.

Blackstone asserts that Gundry "never suggested that any responsive documents should be

withheld" and "didn't seem to care that the documents had been requested by a reporter."  *Id.*, ¶

10.  Gundry echoes Blackstone's remarks, stating that he initially disagreed with Ochoa that the

documents were responsive, but that he "had no interest in not complying with the law."  Gundry

Dep., 247:13-19.

Ochoa points out several inconsistencies in Gundry and Blackstone's accounts of this

incident.  First, Gundry testified that Medina refused to discuss the CPRA requests and that

outside counsel was not involved, and he denies instructing Blackstone to speak to outside

counsel.  Gundry Dep., 190:5-21.  But Blackstone testified that Gundry had directed him to speak

to outside counsel.  Dkt. No. 40, Mehta Decl., Ex. C., Blackstone Dep., 96:5-9.  Medina denied

ever refusing to help Blackstone with Koehn's CPRA request.  Dkt. No. 44, Medina Decl., ¶ 7.

And Cordova recalls Medina and Blackstone arguing over CPRA requests "because [Blackstone]

would exclude her from the CPRA process."  Dkt. No. 31, Cordova Decl., ¶ 31.  Medina's

employment was terminated shortly after this episode.  Dkt. No. 44, Medina Decl., ¶ 15.

Gundry reports several additional grievances related to Ochoa's performance.  First, he

asserts that Ochoa "almost never attend[ed] meetings of the Business Administration Steering

Committee ("BASC"), which he expected her to attend.  Dkt. No. 38, Gundry Decl., ¶¶ 37-39.

Ochoa states that the only time Gundry asked her about BASC attendance was in December 2014.

Dkt. No. 41, Ochoa Decl., ¶ 90.  Second, Gundry expressed his dissatisfaction with Ochoa's

presentations to the Board, which he found shallow.  Dkt. No. 38, Gundry Decl., ¶ 33.  But

Gundry testified that the Board appeared satisfied with Ochoa's presentations, Gundry Dep.,

45:24-47:22, and Green testified that he found the presentations satisfactory, Green Dep., 39:13-

15. Gundry did not discuss his concerns about the presentations with Ochoa. Gundry Dep., 47:9-12. Finally, Gundry asserts that Ochoa's micromanagement of her employees created inefficiencies. Dkt. No. 38, Gundry Decl., ¶ 30. The only time Ochoa recalled Gundry complaining to her about micromanagement was during the W-2 episode, when he accused her of micromanaging Ted O. Dkt. No. 41, Ochoa Decl., ¶ 42.

Gundry met with the Board in closed session on June 29, 2015. Dkt. No. 38, Gundry Decl., ¶ 53. On July 2, 2015, Gundry terminated Ochoa's employment. *Id.*, ¶ 54. As part of her separation, SCCOE paid Ochoa $271,242.76, covering her monthly compensation for the months remaining on the contract and her travel, cell phone, deferred compensation, and vacation pay. Dkt. No. 38, Gordillo Decl., ¶ 13.

Ochoa filed her complaint in this lawsuit in June 2016. She alleges two claims: retaliatory termination in violation of her First Amendment Rights pursuant to 42 U.S.C. Section 1983, and retaliatory termination in violation of California Labor Code Section 1102.5 (a whistleblower statute). Dkt. No. 1. Ochoa seeks damages for lost compensation and employment-related benefits, emotional distress, and out-of-pocket expenses for health care; punitive damages; injunctive relief requiring her reinstatement; and attorney fees and costs. *Id.*

In the present motion, Defendants move for summary judgment, or, alternatively partial summary judgment. Defendants assert that they are entitled to summary judgment on Ochoa's First Amendment claim because (1) Ochoa's speech was not a substantial or motivating factor in the adverse employment action, and (2) Gundry would have terminated Ochoa's employment even absent Ochoa's speech. Defendants assert that Ochoa's termination was the result of the payroll problems, conflict with other cabinet members, micromanagement, failures to attend BASC meetings, shallow board presentations, and misrepresentations to the IRS. Defendants next challenge Ochoa's Section 1102.5 claim, asserting that (1) Ochoa did not engage in a protected activity, (2) there was no causal link between Ochoa's alleged protected activity and the adverse employment decision, and (3) Defendants had legitimate, non-retaliatory reasons for the termination. In the alternative, Defendants move for partial summary judgment as to the February 2015 speech, arguing that (1) it did not address a matter of public concern; (2) Gundry did not

know about Ochoa's report to Green, so it could not have been a motivating factor in his decision; (3) Ochoa's statements were not protected speech under Section 1102.5; (4) there was no causal link between Ochoa's statements to Green and the employment decision; and (5) the February 2015 statements did not occur within a short time before Ochoa's termination. Finally, Defendants contend that they are entitled to discretionary immunity under state law, qualified immunity under federal law, and partial summary judgment on the issue of damages. Dkt. No. 38. Ochoa opposes Defendants' motion, asserting, among other things, that Defendants' proffered reasons for her termination are pretextual.

## REQUEST FOR JUDICIAL NOTICE

Ochoa requests that the court take judicial notice of the fact that an article by Josh Koehn titled "Almost No Paper Trail Exists for $250,000 County School Contracts" was published in *San Jose Inside* in early June 2015. Dkt. No. 45. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Soher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002). The court grants Ochoa's unopposed request. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1198 n.2 (N.D. Cal. 2015) (taking judicial notice of media articles).

## EVIDENTIARY OBJECTIONS

Before addressing each of the parties' specific evidentiary objections, the court addresses the objections that certain evidence is irrelevant and/or lacks foundation. If evidence is irrelevant, it will not create a genuine issue of material fact and "will not be counted" toward the summary judgment determination. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court therefore declines to rule on individual relevance objections. As for the objections that evidence "lacks foundation," courts at the summary judgment stage focus not on the form of the evidence submitted by the parties but on the admissibility of its contents. Objections that evidence lacks foundation challenge the form of the evidence. *Bohnert v. Roman Catholic Archbishop of S.F.*, 136 F. Supp. 3d 1094, 1111 (N.D. Cal. 2015). The court therefore overrules the parties'

objections that evidence lacks foundation. The court's rulings on the parties' remaining evidentiary objections are appended to this order.

### LEGAL STANDARD

The court should grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the moving party bears the initial burden of producing evidence demonstrating the absence of a triable issue of material fact; or, if the nonmoving party would bear the burden of proof on an issue at trial, the moving party need only show an absence of evidence in support of a claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). If the moving party meets this burden, the burden shifts to the non-moving party to demonstrate a genuine issue of material fact. *Id.* at 324. A "genuine issue" of material fact exists if the non-moving party's evidence, viewed in the light most favorable, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### DISCUSSION

**I.     The First Amendment Claim (42 U.S.C. Section 1983).**

Under certain circumstances, the First Amendment shields public employees from retaliation for speaking as private citizens on matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To survive summary judgment on a First Amendment claim, a plaintiff must first establish that she has engaged in protected speech activities by showing that she (1) spoke on a matter of public concern (2) as a private citizen, and (3) that her protected speech was a "substantial or motivating factor in the adverse employment action." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009); *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012) (reciting the *Eng* factors). If the plaintiff establishes these three factors, the burden shifts to the state to establish that it (1) "had an adequate justification for treating the employee differently from other members of the general public," or (2) "would have taken the adverse employment action even absent the protected speech." *Id.*

Defendants first move for partial summary judgment on the basis that Ochoa's February 2015 speech did not address a matter of public concern. Defendants assert that Gundry's personal

8

tax liability is not a matter of public concern because it has nothing to do with SCCOE's official business.

Whether speech addresses a matter of public concern is a question of law. *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). The answer is determined "by the content, form, and context of a given statement, as revealed by the whole record." *Id.*, at 147-48. "If an employee's expression relates to an issue of 'political, social, or other concern to the community,' as distinct from a mere personal grievance, it is fairly characterized as addressing a matter of public concern." *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999). Matters of public concern include "'unlawful conduct by a government employee.'" *Antoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 748-49 (9th Cir. 2010) (quoting *Huppert v. City of Pittsburg*, 574 F.3d 696, 703-04 (9th Cir. 2013), *overruled on other grounds by Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013)). In contrast, individual personnel disputes "that would be of no relevance to the public's evaluation of the performance of governmental agencies" are likely of private concern. *Id.* (quoting *Eng*, 552 F.3d at 1070).

Defendants' characterization of Plaintiff's alleged protected speech is too narrow. The issue the speech addressed is not, as Defendants assert, Gundry's personal tax liability. Instead, it is whether Gundry sought to harass and bully Ochoa and O into incorrectly preparing a tax form. Whether a public employee—the highest-ranking official responsible for managing a school district—is encouraging his subordinates to commit fraud is a matter of public concern, as is the allegedly threatening and bullying approach he employs toward his employees. The community has an interest in the ethics and management style of the individuals running its school system. *See Lambert v. Richard*, 59 F.3d 134, 136 (9th Cir. 1995) (determining that a library director's management style was a matter of public concern).

Defendants next assert that Ochoa's speech activities were not a substantial or motivating factor in Gundry's adverse employment decision.[1] Defendants argue that the decision to terminate

---

[1] Defendants also asserted, at the hearing on this motion, that Plaintiff's speech was not made as a private citizen. As this argument was made for the first time at the hearing, the court declines to consider it at present.

Ochoa's employment had nothing to do with her complaint about the W-2 episode or her CPRA e-mails, but was instead motivated by legitimate, non-retaliatory reasons. Defendants further contend that Gundry had no reason to care about the CPRA e-mails as long as the documents produced were responsive, and that he had already decided to terminate Ochoa's employment months earlier (e.g., he asked Gordillo to prepare a termination letter in March). Finally, Defendants move for partial summary judgment on the February 2015 protected speech incident, arguing that Ochoa's speech could not have motivated Gundry's termination decision because he was not aware that Ochoa participated in the complaint.

A plaintiff may establish that retaliation was a substantial or motivating factor for an adverse employment decision in one of three ways. She may show (1) that the speech and adverse action "were proximate in time, such that a jury could infer that the action took place in retaliation for the speech;" (2) that the employer opposed the speech; or (3) that the employer's non-retaliatory explanations for the adverse action were "false and pretextual" or "unworthy of credence." *Antoine* 605 F.3d at 750; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). With respect to the first approach, district courts have found that gaps of eight or fewer months between speech and adverse action may yield causal inferences, but this determination must depend on context, rather than on a mechanical calculation of time. *Id.*, at 751; *Coszalter v. City of Salem*, 320 F.3d 968, 970, 977 (9th Cir. 2003). As for the third approach, a plaintiff's claim may survive summary judgment by casting substantial doubt on Defendants' explanations. *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1130 (E.D. Cal. 2006) ("If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.") (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994)).

Defendants assert that they are entitled to partial summary judgment as to the February 2015 speech because Ochoa, by failing to prove that Gundry was aware of the speech, has not established that it was a substantial or motivating factor behind his decision. Plaintiff, however, has created a genuine issue of material fact as to whether Gundry was aware of Ochoa's speech despite his denials. *See Marable v. Nitchman*, 511 F.3d 924, 930 (9th Cir. 2013) (temporal

proximity created an issue of material fact despite the defendant's claim that he was not aware of the plaintiff's speech). First, Gundry testified that he was aware of *a* complaint about the tax issue, and Green testified that she spoke to Gundry about the O-Ochoa complaint multiple times. Second, Ochoa observed a chilling in Gundry's behavior toward her and stated that their regular meetings ceased within one month after the W-2 confrontation. Third, Gundry himself offered evidence that he took his first steps to terminate Ochoa's employment (by asking Gordillo to draft a termination letter) shortly after he would have learned about the complaint. These circumstances create a genuine issue of material fact as to Gundry's knowledge of the February 2015 speech such that partial summary judgment is not warranted.

Defendants next argue that Ochoa has failed to show that the June 2015 speech was a substantial or motivating factor for the adverse employment decision because Gundry had no reason to care about Plaintiff's CPRA-related speech, and because Gundry had already made his decision at that time. Ochoa, however, has created another genuine issue of material fact as to whether her CPRA-related speech motivated her termination. The CPRA request at issue concerned contracts promoted by Gundry, a subject that had been covered in the media earlier in May and June 2015. Koehn, the reporter who ultimately issued the relevant CPRA requests, published several critical articles pertaining to SCCOE contracts with Skvarna's company. Medina had raised concerns about Skvarna's company and his qualifications. The subject was apparently the sources of so much "tension and discord" in May and June 2015 that Skvarna decided not to continue consulting. In this fraught environment, a reasonable jury could infer that Gundry cared about Koehn's continued investigations, that he may have been irked by Ochoa's insistence that additional contracts should be produced to Koehn, and that this speech may have been a substantial factor in his decision to terminate Ochoa's employment.[2]

Gundry's argument that the CPRA requests did not motivate his decision because that decision had already been made does not entitle Defendants to summary judgment. Gundry

---

[2] The inconsistent evidence about whether Gundry directed Blackstone to speak to outside counsel about the CPRA requests, the evidence that Medina and Blackstone argued about CPRA requests, and Medina's own termination shortly after June 2015 could all contribute to such an inference.

claims that he only waited until July to terminate Ochoa's employment because (1) he wanted to ensure that he had Board support and (2) he was concerned about the expense of buying out her contract. But Gundry did not need Board support for Ochoa's termination. And his argument that he knew he had Board support after a closed session meeting in June 2015—the contents of which he cannot describe due to the Brown Act—is not sufficiently persuasive to merit summary judgment.[3] As for the expense of buying out the time remaining on Ochoa's contract, the contract capped any such payment to twelve months of salary, so Gundry's decision to terminate her in July rather than March saved, at most, one month of salary. Finally, though Gundry may have asked Gordillo to begin the process of terminating Ochoa's employment in March, he was not inexorably committed to this path. The fact that Ochoa's termination followed on the heels of the CRPA requests, combined with the other factors discussed above, creates a genuine issue of material fact as to whether Ochoa's CRPA speech was a motivating factor behind her termination.

Next, Defendants assert that neither speech act was a substantial or motivating factor in the termination decision because Gundry had many legitimate non-discriminatory reasons for the termination. Defendants repeat this argument in claiming that SCCOE would have terminated the adverse employment action even absent Ochoa's protected speech. As Defendants' argument and Ochoa's response—that Defendants' reasons are false, pretextual, or unworthy of credence—are the same for Defendants' attack on Ochoa's *prima facie* case as they are for Defendants' rebuttal, the court addresses these two areas simultaneously.

Gundry asserts six non-retaliatory reasons for Ochoa's termination: (1) Ochoa's role in the payroll problems, (2) her involvement with misrepresentations to the IRS, (3) her conflict with other cabinet members, (4) her micromanagement of her department, (5) her shallow Board presentations, and (6) her failure to attend BASC meetings. Ochoa casts sufficient doubt on these explanations to survive summary judgment.

---

[3] Defendants argue that, "[t]he discussions that occurred during that meeting would unequivocally explain the timing of Mr. Gundry's decision to proceed with Plaintiff's termination." But at summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Viewed in that light, the mere fact that there was a closed session meeting of the Board before Gundry acted to terminate Ochoa does not yield the unequivocal inference Defendants seek.

Gundry reportedly concluded from the payroll audit that Ochoa mismanaged her department and bore responsibility for the payroll errors. But Gundry was aware of the payroll problems as early as November 2014. And he never issued any written discipline to Ochoa regarding her handling of the payroll errors or spoke to her about the problems he attributed to her. Admittedly, as Gundry could terminate Ochoa's employment without cause, Gundry did not need to do these things. The fact that he did not even speak to her about the potential issues, however, combined with the fact that payroll remained under Ochoa's purview long after Gundry learned of the errors, could suggest that payroll errors may not have spurred Ochoa's termination.

Ochoa similarly casts doubt on Gundry's argument that the IRS misrepresentations motivated Ochoa's termination. Gundry himself testified that Ochoa "had nothing to do with" the IRS misrepresentations.

Gundry's assertion that Ochoa's inability to get along with other cabinet members motivated his decision is more persuasive, as there is ample evidence that the cabinet did not work well together. But Gundry and Ochoa both produced evidence showing that conflict in the cabinet was epidemic. A reasonable jury could question why Ochoa was singled out for termination.

Next, Defendants proffer Ochoa's micromanagement as a reason for her termination. Gundry testified that he discussed this problem with Ochoa twice, the second time in early 2015. Ochoa, however, only recalls micromanagement coming up in relation to the W-2 episode. And Ochoa points out that Gundry, during his deposition, could not recall any specific contracts that did not get signed or bills that did not get paid because of Ochoa's management style. Ochoa's evidence, and the large amount of time that passed between Gundry's detection of a problem and his action, casts some doubt on this reason.

Ochoa raised similar reasons for doubt as to Gundry's explanations that Ochoa's shallow Board presentations and her BASC non-attendance motivated her termination. Gundry testified that he did not discuss his concerns about Ochoa's presentations with Board members, and Green testified to being satisfied with the presentations. Additionally, Ochoa asserted that the only time Gundry asked her about BASC meetings was in December 2014, by e-mail.

Plaintiff has created sufficient doubt about Defendants' proffered reasons that a reasonable

jury could question the reliability of Defendants' asserted reasons as a whole. *See Burch v. Regents of the Univ of Cal.*, 433 F. Supp. 2d 1110, 1130 (E.D. Cal. 2006) ("If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder."). Ochoa has thus created genuine issues of material fact as to whether her speech was a substantial or motivating factor for Defendants' adverse employment decisions and whether Defendants would have made the same decisions even absent her speech.

## II.     The Section 1102.5 Claim.

California Labor Code Section 1102.5(b) protects employees from retaliation for disclosing information to a person with authority when "the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation[.]" When a Plaintiff alleges retaliatory employment termination, California courts follow the burden-shifting analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007). That is, the plaintiff must first establish a prima facie case of retaliation; then, the burden shifts to the defendant to provide a legitimate, non-retaliatory explanation for its actions; and, finally, the plaintiff must show that the defendant's explanation is pretextual. *Patten v. Grant Joint Union High School Dist.*, 134 Cal. App. 4th 1378, 1384 (2005). To establish a prima facie case of retaliation, "the plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Loggins*, 151 Cal. App. 4th at 1109 (quoting *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005)).

Defendants first argue that Ochoa did not engage in a protected activity as to her February 2015 speech because she did not report an *actual* violation of the law. Further, though Defendants included this argument in the "causal link" section of their motion, Defendants argue that Plaintiff did not engage in a protected activity because she did not report a violation of the law to *Gundry*.

Under Section 1102.5, a plaintiff does not need to name the specific statute she thinks has

14

been violated; it is enough that she disclose "what she has reasonable cause to believe is a violation of a state or federal statute." *Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1155 (N.D. Cal. 2013). Further, an *actual* violation is not required. *Devlyn v. Lassen Mun. Util. Dist.*, 737 F. Supp. 2d 1116, 1124 (E.D. Cal. 2010) ("Defendant's argument inappropriately alters the definition of 'protected activity,' implying that the person reporting the suspected violation must be correct in order to be protected. That is not what the statute requires."). Defendants again cast the illegal activity as whether Gundry paid his taxes, and not, as Plaintiff asserts, whether Gundry bullied Ochoa and O into intentionally preparing an incorrect W-2. Whether Gundry ultimately paid his taxes is irrelevant. Considering the circumstances surrounding Gundry's confrontation with O and Gundry's reportedly aggressive behavior, Ochoa raises a genuine issue of material fact as to whether she had reasonable cause to believe there had been a violation of a state or federal statute.[4] Additionally, Section 1102.5 does not require the employee to report information to her direct supervisor; the statute protects employees who report information "to a government . . . agency" or "a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance." Though Ochoa does not report directly to the Board of Education, the Board has authority to investigate and correct violations—including, potentially, to replace Gundry. Defendants' arguments that Ochoa has not engaged in a protected activity do not support a grant of summary judgment.

Defendants next argue that there is no causal link between Ochoa's protected activity and her termination. Defendants argue that no such link existed because (1) Gundry did not know of Ochoa's February report, (2) the February statements did not occur a short time before Ochoa's termination, and (3) Gundry had already decided to terminate Ochoa before her CPRA e-mails. The court, however, has already concluded that Ochoa raised a genuine issue of material fact as to whether Gundry knew about the February report. As to the second argument, Gundry states that the February speech cannot support a causal link based on temporal proximity because Gundry decided to terminate Ochoa in June, and that the June speech cannot support a causal link because

---

[4] That is, taking the evidence in the light most favorable to Ochoa, she had reasonable cause to believe there had been a violation of state or federal law.

Gundry decided to terminate Ochoa in March. Defendants cannot have it both ways. In any event, Ochoa presents other evidence sufficient to create a genuine issue of material fact regarding a causal link for the February speech in addition to evidence of temporal proximity (i.e., evidence that Gundry's demeanor toward her shifted and that their one-on-one meetings ceased). As to Defendants' third argument, since Gundry's request that Gordillo prepare a termination letter was reversible, this fact does not entitle Defendants to summary judgment.

Finally, Defendants argue that they have produced evidence supporting their legitimate non-retaliatory reasons for termination. But the court has already addressed these reasons and Ochoa's evidence suggesting that they are pretextual. For the same reasons that applied with respect to the First Amendment claim, the court concludes that Ochoa has created a genuine issue as to whether Defendants reasons were pretextual.

## III.    Qualified Immunity.

Qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts analyzing questions of qualified immunity must determine (1) whether there is a constitutional violation, and (2) whether the right was clearly established. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012). Whether a right is clearly established depends on whether "a reasonable official would understand that what he is doing violates" the right at issue. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In analyzing qualified immunity, the court "resolve[s] all factual disputes in favor of the party asserting the injury." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013).

In light of the discussion above, and resolving all factual disputes in favor of Ochoa, the court can assume (for the purposes of the immunity analysis) that Ochoa spoke on an issue of public concern and that her speech was a motivating factor in Gundry's decision to terminate her employment. If this assumption is correct, then Ochoa will have established a violation of her constitutional rights.

As for whether the right is clearly established, public employees have had a First

16

1    Amendment right to be free from retaliation for speaking out on matters of public concern for a

2    half-century.  *Ellins*, 710 F.3d at 1065.  At the time Gundry acted, public employees had the right

3    to be free from retaliation for reporting unlawful conduct from a government employee.  *Thomas*

4    *v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004) (citing cases).

5        "If [Ochoa's] version of the facts turns out to be true, defendants will not be entitled to

6    qualified immunity."  *See Coszalter v. City of Salem*, 320 F.3d 968, 979 (9th Cir. 2003).

7    **IV.    Discretionary Immunity.**

8        California Government Code Section 820.2 entitles a public employee to immunity from

9    civil damages resulting from his or her acts or omissions "where the act or omission was the result

10   of the exercise of the discretion vested in [the official], whether or not such discretion be abused."

11   Public entities are also not liable for injuries resulting from the acts or omissions of their

12   employees where the employees are immune.  Cal. Gov. Code § 815.2.  A statute may only

13   remove this immunity if there is "a clear indication of legislative intent that statutory immunity is

14   withheld or withdrawn in [a] particular case."  *Caldwell v. Montoya*, 10 Cal. 4th 972, 986 (1995).

15       Though Gundry's decision to terminate Ochoa was discretionary, discretionary immunity

16   does not apply to violations of whistleblower statutes.  *S. Cal. Rapid Transit Dist. v. Superior*

17   *Court*, 30 Cal. App. 4th 713, 726 (1994) ("To recognize that [the employer's] discharge of

18   plaintiff[] was simply a discretionary act to which qualified immunity applied, even though such

19   discharge was a retaliatory act expressly prohibited by [a whistleblower statute], would emasculate

20   the entire effect and purpose of the statute."); *see also Caldwell v. Montoya*, 10 Cal. 4th at 986 n.7

21   ("Insofar as such whistleblower statutes focus in particular on those who act to suppress or punish

22   revelations of fraud, corruption, or illegality in government business, the core statutory objectives

23   might well be obviated by a conclusion that cover-up efforts by a public official are eligible for

24   immunity.  By their specific nature and purpose, such laws may indeed provide 'a clear indication

25   of . . . intent' . . . that the personal immunities of public employees are abrogated.").  If Plaintiff's

26   version of the facts turns out to be true, Defendants are not entitled to discretionary immunity.

27   **V.    Damages.**

28       Finally, Defendants move for partial summary judgment on the issue of damages.

                                        17

Defendants assert that the recovery for a wrongfully discharged employee is the salary agreed upon for the period of service remaining in the contract less any amount that the employer proves the employee has earned or might have earned from other employment.  SCCOE states that it paid $271,242.77 to Ochoa upon her termination, which, it asserts, was the amount she would have received had her contract not been terminated.  As such, SCCOE argues, Ochoa is not entitled to any further damages for lost wages.  Ochoa responds that damages—which she states could include damages for "front pay"—are typically a question for the jury.

The court agrees with Defendants that Ochoa is not entitled to any additional damages for lost wages for the period remaining on her contract (that is, through June 30, 2016) and will grant Defendant's motion for partial summary judgment on this question.  Whether Ochoa is entitled to damages for lost wages for the period *after* the end of her contract—that is, whether her contract would have been renewed or extended—is another matter.  This is a question of fact that Ochoa may present to a jury.  *See* Cal. Civ. Jury Instr. (CACI) 2422, 2433; *see also* CACI 2407.  Though the proposition that Gundry would have re-upped Ochoa's contract may be a hard story to sell, the court cannot say as a matter of law that no reasonable jury would buy it.

## CONCLUSION

The court grants partial summary judgment for the Defendants solely on the issue of damages for lost wages for the period extending from Ochoa's termination to the end of her contract term (June 30, 2016).  In all other respects, the court denies Defendants' motion.

**IT IS SO ORDERED.**

Dated: 6/5/2017

HOWARD R. LLOYD
United States Magistrate Judge

18

# APPENDIX: EVIDENTIARY RULINGS

**1. Ochoa's Objections.**

| Source | Objection | Resolution |
|---|---|---|
| Dewan Decl., ¶ 2: "Multiple cabinet members expressed their frustration to me with Plaintiff being ineffective, inefficient, and causing delay in processing contracts." | Hearsay. | Overruled. Not offered to prove the truth of the matter asserted (that declarants were frustrated), but to provide a basis for Dewan's opinions of Plaintiff. |
| Dewan Decl., ¶ 3: "It was reported to me that the payroll errors occurred due to Plaintiff's poor oversight and ill-advised procedural changes in the payroll unit." | Hearsay; Improper expert opinion. | Overruled. Not offered to prove the truth of the matter asserted (that Plaintiff was at fault), but to provide a basis for Dewan's lay opinions of Plaintiff. |
| Blackstone Decl., ¶ 6: "I was advised that two additional contracts … were potentially responsive …" | Hearsay. | Overruled. Not offered to prove the truth of the matter asserted, but to provide a basis for Blackstone's subsequent actions. |
| Blackstone Decl., ¶ 7: "Kelly Brewer had previously checked for any payments to the law firm, but did not find the invoice." | Lack of personal knowledge; Hearsay. | Overruled. No out-of-court statement. Blackstone testifies that he spoke to staff about gathering documents, Blackstone Decl., ¶ 3, which is sufficient to establish his personal knowledge of the matter, *see* Fed. R. Evid. 602. |
| Gordillo Decl., ¶ 4: "I felt that Plaintiff did not have a good working relationship with at least some of the cabinet members, particularly Kelly Calhoun." | Hearsay. | Overruled. No out-of-court statement. |
| Gordillo Decl., ¶ 4: "I also heard numerous complaints from other SCCOE employees about Plaintiff … " | Hearsay. | Overruled. Not offered to prove the truth of the matter asserted (the content of the complaints) but to provide a basis for Gordillo's opinions. |
| Gordillo Decl., ¶ 12: "[Gundry] told me that he wasn't ready to proceed [with terminating Ochoa] because he was concerned about certain board members who still supported Plaintiff." | Hearsay; Double hearsay. | Overruled. Fed. R. Evid. 803(3) ("statement of declarant's then-existing state of mind (such as motive, intent, or plan)"). |
| Gundry Decl., ¶ 17: "During the fall of 2014, it was my | Hearsay. | Overruled. No out-of-court statement. |

| Source | Objection | Resolution |
|---|---|---|
| impression that Plaintiff did not have a good working relationship with her fellow cabinet members, particularly Mary Ann Dewan, Phillip Gordillo, Kelly Calhoun, and Phil Benfield." | | |
| Gundry Decl., ¶ 20: "The auditor told me that Plaintiff's decisions resulted in a breakdown of internal controls, which thereby led to the payroll errors in 2013." | Hearsay. | Overruled. Not offered to prove the truth of the auditor's remarks, but to explain Gundry's state of mind toward Ochoa.[5] |
| Gundry Decl., ¶ 23: "According to the report and information relayed to me by the auditor, thousands of payroll records would need to be reviewed and corrected in order to fix the errors." | Best evidence; Hearsay. | Overruled. Objection as to form of evidence. Not offered to prove the truth of the auditor's report, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 25: "I was also told that the process of correcting these errors would take months and would likely cost hundreds of thousands of dollars. Additionally, I learned that SCCOE could face penalties from the IRS and California Franchise Tax Board due to the 2013 payroll errors." | Hearsay. | Overruled. Not offered to prove the truth of the out-of-court statement, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 27: "When I reviewed the draft report, I also learned that Plaintiff and/or her direct subordinate, made misrepresentations to the IRS in an effort to avoid a $174,000 penalty against the SCCOE." | Best Evidence; Hearsay. | Overruled. Objection as to form of evidence. Not offered to prove the truth of the report's contents, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 28: "When I | Best evidence; | Overruled. No out-of-court |

---

[5] To prove that he would have terminated Ochoa's employment even absent the protected speech, Gundry need not prove that his alternative reasons for terminating Ochoa's employment were fully justified (e.g., that Ochoa was *actually* responsible for payroll mistakes); it is sufficient for him to prove that he had these other reasons (e.g., he *believed* Ochoa was responsible for payroll mistakes). The court notes that it admits these statements not as evidence of the truth of their content, but as evidence of Gundry's motivations for terminating Ochoa's employment.

| Source | Objection | Resolution |
|---|---|---|
| learned about this issue [misrepresentations to the IRS], it was not clear whether the misrepresentations were intentional or a mistake." | Hearsay. | statement. |
| Gundry Decl., ¶ 30: "Also during fall of 2014, I learned that Plaintiff was micromanaging … "; "I learned that multiple departments made complaints … " | Hearsay. | Overruled.  Not offered to prove the truth of the complaints, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 31: "I soon learned that [inefficiencies] was exactly what was happening. I was told that numerous contracts and payments were not getting processed … ." | Hearsay. | Overruled.  Not offered to prove the truth of the matter asserted, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 31: "Multiple employees were hesitant to even speak with me and frequently told me they would have to get Plaintiff's approval … " | Hearsay. | Overruled.  Not offered to prove the truth of the matter asserted, but to explain Gundry's state of mind toward Ochoa. |
| Gundry Decl., ¶ 35: "I actually confirmed with my Information Technology director that Ted O received my emails but had not even taken the time to open and read them." | Hearsay. | Overruled.  Not offered to prove the truth of the matter asserted (that Ted O received and ignored e-mails), but to explain Gundry's state of mind toward O. |
| Gundry Decl., ¶ 39: "When I spoke with the chairwoman, she told me … "; "I then reviewed the BASC meeting attendance to confirm." | Hearsay; Best evidence. | Overruled.  Objection as to form of evidence.  Not offered to prove that Ochoa did not attend BASC meetings, but to explain Gundry's state of mind toward Ochoa. |

**2. Defendants' Objections.**

| Source | Objection | Resolution |
|---|---|---|
| Ochoa Decl., ¶ 6: "I am a dedicated and experienced professional . . . ." | Improper Character Evidence. | Overruled; the statement objected to goes to Plaintiff's experience, not her character; additionally, Plaintiff's character—inasmuch as her behavior and attitudes may have been a factor in Gundry's termination decision—is |

21

| Source | Objection | Resolution |
|--------|-----------|------------|
| | | at issue. |
| Ochoa Decl., ¶ 60: "Rossi told me that Gundry was angry that I had submitted this complaint against him." | Hearsay. | Overruled.  The statement is not offered to prove the truth of the matter asserted (that Gundry was angry), but to prove that Gundry knew about the complaint. |
| Ochoa Decl., ¶ 61: "Rossi referenced his moving expenses and that the Board had discussed the complaint in closed session.  Rossi told me that Gundry said that he did not trust us with reporting his moving expenses." | Hearsay; Violates closed session privilege. | Hearsay: overruled.  The statement is not offered to prove the truth of the matter asserted (that Gundry did not trust Ochoa and O), but to prove that Gundry knew about the complaint.<br><br>Privilege: overruled.  "The Brown Act is not a privilege recognized under federal law."  *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1126 (N.D. Cal. 2003); *Kaufman v. Bd. Of Trustees*, 168 F.R.D. 278 (C.D. Cal. 1996). |
| Ochoa Decl., ¶ 62: "Rossi said she would request a formal investigation[.]" | Hearsay. | Overruled.  Statement of declarant's intention.  *See* Fed. R. Evid. 803(3); *Mut. Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285 (1892). |
| Ochoa Decl., ¶ 63: "After asking for follow-up a few times, Green eventually e-mailed us saying if such conduct happened again, we should complain to Human Resources." | Hearsay. | Overruled; objection as to form of evidence. |
| Ochoa Decl., ¶ 71: "These various contracts were an issue of public concern as they were all for the same thing: a 2013 audit of SCCOE finances." | Hearsay. | Overruled; not offered to prove the truth of the matter asserted (the contents of the contracts), but to explain Plaintiff's beliefs as to the responsiveness of the contracts to the CPRA request. |
| Ochoa Decl., ¶ 74: "In May 2015, Skvarna had been the subject of intense media scrutiny due to Gundry's significant contracts of public funds with him." | Hearsay. | Overruled; no out-of-court statement. |
| Ochoa Decl., ¶ 80: "Rimmerman found some 2013 payroll problems and recommended we go through all payroll records." | Hearsay. | Overruled; not offered to prove the truth of the matter asserted, but to explain Ochoa's subsequent actions. |

| Source | Objection | Resolution |
|--------|-----------|------------|
| Ochoa Decl., ¶ 85: "I recommended SCCOE terminate [an employee], and began the process to terminate her." | Hearsay. | Overruled; objection to form of evidence. |
| O Decl., ¶ 29: "I told Ochoa that I was worried for my safety, and about retaliation from Gundry." | Hearsay. | Overruled; objection to form of evidence. |
| Medina Decl., ¶ 8: "During an open board session, Gundry disclosed that he wanted to get Mark Svarna's contract extended but I advised him that he could not enter into a legal services agreement with him since he was not an attorney." | Hearsay. | Overruled; admission of a party. |
| Medina Decl., ¶ 9: "I complained to Darcie Green that [Skvarna] made a racist comment . . . ." | Hearsay. | Overruled; objection to form of evidence; not offered to prove the truth of Skvarna's comment. |
| Medina Decl., ¶ 14: "I also complained to Darcie Green . . . ." | Hearsay. | Overruled; objection to form of evidence. |
| Medina Decl., ¶ 15: "I complained about Svkarna's racist and sexist comments . . . ." | Hearsay. | Overruled; objection to form of evidence; not offered to prove the truth of Skvarna's comment. |
| Cordova Decl., ¶ 17: "Maribel Medina, General Counsel, told me she was concerned about Skvarna's contract, but that Gundry had told her to fix it and make it work." | Hearsay. | Overruled; objection to form of evidence; Gundry's comment is not a "statement." |
| Ochoa Decl., ¶¶ 20, 21, 22, 23, 24. | Improper Character Evidence. | Overruled; not offered to prove that Ochoa acted in accordance with her character, but to demonstrate Cordova's impressions of Ochoa (and of others' impressions of her). |
| Cordova Decl., ¶ 31: "I observed that [Medina] and [Blackstone] would argue at times . . . ." | Improper Character Evidence. | Overruled. |
| Cordova Decl., ¶ 32: "Both Ochoa and Medina expressed to me that they were | Hearsay. | Overruled; objection to form of evidence. |

United States District Court
Northern District of California

| Source | Objection | Resolution |
|---|---|---|
| concerned about the Skvarna contracts and believed they were problematic for the SCCOE." | | |
| Cordova Decl., ¶ 34: "I . . . observed that [Benfield] constantly complained about everything.  He was one of the most negative people I know." | Improper Character Evidence. | Overruled; this statement is not offered to prove that Benfield complained about Ochoa. |